## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

HOLLY S.,

                                      Plaintiff,

      v.

                                          3:20-CV-1632

KILOLO KIJAKAZI, ACTING                (ATB)
COMMISSIONER OF SECURITY,

                                   Defendant.

PETER A. GORTON, ESQ., , for Plaintiff
CANDACE LAWRENCE, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

### MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I.   PROCEDURAL HISTORY

On June 22, 2018, plaintiff protectively filed an application for a period of disability and disability insurance benefits ("DIB") and an application for Supplemental Security Income ("SSI"), alleging that she became disabled on August 1, 2016. (Administrative Transcript ("T.") 67, 218-31). Both applications were denied initially on October 9, 2018. (T. 116-24). Plaintiff requested a hearing, which was held by video conference on February 18, 2020[1] before Administrative Law Judge ("ALJ")

---

[1] ALJ Penn began the hearing on October 18, 2019, but postponed the case so that plaintiff could obtain representation by counsel. (T. 56-61).

Laureen Penn. (T. 63-95). Plaintiff, then represented by counsel, and Vocational Expert ("VE") Matthew Lampley testified at the hearing.[2] (*Id.*) ALJ Penn issued an unfavorable decision on April 17, 2020, which became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on November 2, 2020. (T. 1-5 (AC Denial), 10-26 (Hearing Decision)).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

---

[2] Through counsel, plaintiff requested that a friend of hers be allowed to testify. The ALJ denied the request at the start of hearing, but stated that plaintiff could renew her request after completing her testimony. (T. 10, 66-67). In her decision, the ALJ noted that plaintiff's request was never renewed. (T. 10).

disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of

review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

Plaintiff was born on August 10, 1984 and was 31 years old on August 1, 2016, the alleged date of her disability onset. (T. 24, 96).  Plaintiff is single, lives in a trailer, with her two sons, and shares custody of her daughter, who she sees every other week.[3]

---

[3] The court notes that in a function report, dated September 11, 2018 and completed for plaintiff by "caseworker," Karen Demitros, it states that plaintiff's two boys were 16 and 13, and her daughter was 10. (T. 293).  However, the report also states that plaintiff had the boys "half" the time, but her 10 year-old daughter was "mostly w/her." (*Id.*)

(T. 73, 77, 292).  Plaintiff completed the 11th grade but did not finish high school, nor did she obtain a high school equivalency diploma. (T. 69, 260).  Plaintiff claims that her disability is due to various medical impairments, including post traumatic stress disorder; panic disorder; generalized anxiety disorder; irritable bowel syndrome; Graves disease; hyperthyroidism; goiter; lumbar radiculitis; and sacroiliitis. (T. 97).  At the hearing, plaintiff testified only with respect to her anxiety and her back impairment, which was caused by an injury she sustained at work in 2016, after which she no longer worked. (T. 68-72, 74-75).

Plaintiff testified that her anxiety makes it hard for her to leave the house, gives her hives, and has caused her to gain weight. (T. 68).  Plaintiff stated that the anxiety results in an inability to articulate; she "can't think of what to say." (T. 68).  Plaintiff testified that she had panic attacks due to the anxiety, her pulse raced, and sometimes things went "black." (T. 69).  She stated that she went to the hospital "numerous" times as a result; however, when asked to specify the "last time," plaintiff testified that she had not gone to the hospital for "many years," and not since she began taking her anxiety medication. (*Id.*)

Plaintiff testified that, in 2016, when she was working for CVS, she was on a ladder, reaching for an item on the top shelf. (T. 74-75).  She stated that the product for which she was reaching was too heavy "for that level." (T. 75).  When she attempted to pull the product off the shelf "it pulled on [her] right side in [her] back," and she immediately dropped the product. (*Id.*)  She stated that, by the time she got down off the ladder, she discovered that her right leg "didn't work," she was in excruciating pain,

and she could not walk. (*Id.*)

Plaintiff testified that she suffers pain mostly in her low back and hip on the right side, and that the pain travels down her right leg, resulting in numbness and an inability to walk. (T. 69). Plaintiff testified that she could not stand very long, and that she must sit down because her low back begins to hurt. The numbness makes it hard to walk, and plaintiff testified that she "falls a lot." She estimated that she had fallen approximately five to six times in the previous six months, but stated that she never had to go to the hospital as a result of any of these falls. (T. 69-70).

Plaintiff testified that she had good days and bad days, but the bad days outnumbered the good ones. (T. 71). On a bad day, she was unable to walk, and even sitting caused her pain. Some days the pain was so bad that she did not get out of bed at all. (T. 71-72). She estimated that she had bad days approximately seven to ten days per month. (T. 72). Plaintiff also testified that the anxiety and the pain disrupted her sleep, so that she only slept three to four hours per night and was tired and had to nap twice during the day for 35-40 minutes. (T. 69, 72-73).

Plaintiff estimated that she could stand for 10 to 15 minutes at a time, sit for 15 minutes, and walk only 20 to 30 feet. (T. 73). She testified that she could lift a gallon of milk, but it would be painful. (*Id.*) Reaching forward or overhead was also very painful, as were pushing and pulling. (*Id.*) However, she clarified that she could reach over her head to do her hair, but that she could not reach to get something off a shelf. (T. 77). Plaintiff stated that her friend, Kim, and plaintiff's two teenaged sons helped with household chores. (T. 73). Plaintiff testified that Kim came to plaintiff's house

five to six days per week to help her, sometimes staying there all day. (T. 73-74, 75, 78).  Plaintiff stated that being around a lot of people in a store made her anxious, and that Kim accompanied her to the grocery store. (T. 74).  Plaintiff testified that Kim cut her hair because her anxiety makes it difficult for her to go to a beauty salon. (T. 78).

Plaintiff's daily activities included getting her "youngest" ready for school, after which she tried to "pick up." (T. 76).  Plaintiff stated that she then showered, watched television, and waited for her children to get home from school. (T. 76).  She attended three of her son's football games in a period of two months, but she had no hobbies, and she did not belong to any groups. (*Id.*)  Plaintiff testified that her 10 year-old daughter was with her every other week, and that when they were together, they watched movies, painted their nails, read, and colored. (T. 77).

The plaintiff's testimony regarding her prior work was unclear, and she had trouble remembering the companies for which she worked and the duties which she performed. (T. 79-84).  Plaintiff held a variety of short-term jobs, some of which did not qualify as substantial gainful activity ("SGA"). (*Id.*)  Ultimately, the VE was asked to classify plaintiff's work as a voting machine assembler, gas station cashier, stocker at CVS, envelope stuffer, and dispatcher, the only jobs that plaintiff performed long enough to qualify as SGA. (*Id.*)

After the VE discussed the plaintiff's former work, the ALJ proposed a hypothetical question.  The ALJ asked the VE to assume that the hypothetical individual could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk for 4 hours, sit for 6 hours; could occasionally climb ramps and stairs,

stoop, crouch, and kneel; but could not crawl, climb ladders, ropes, or scaffolds. (T. 86). The individual could occasionally push, pull, and operate foot controls with her right lower extremity. Further, the hypothetical individual could not have concentrated exposure to extreme cold, vibration, or workplace hazards, including exposure to unprotected heights and moving machinery. (*Id.*)

Mentally, the hypothetical individual could perform simple, routine, repetitive work, involving occasional decision making and occasional changes in the work setting. (*Id.*) The person could frequently interact with co-workers and supervisors, could occasionally interact with the public, but could not provide direct customer service. (T. 86-87). Finally, the individual would not be able to perform tasks involving fast-paced production. (T. 87).

The VE testified that, based on the ALJ's hypothetical, the plaintiff could not perform any of her previous work. (T. 88). However, plaintiff would still be able to perform the light work jobs of routing clerk, collator operator, and sorter. (*Id.*) Because of the pace limitation, the VE could not list any other jobs. (*Id.*) If the individual were limited to sedentary work, the job of addressing clerk would be available. (T. 89). The VE testified that the jobs would still be available if the individual could only reach overhead "occasionally," but that no jobs would be available if overhead reaching was precluded entirely. (T. 89).

The ALJ then removed the total reaching limitation, but added the limitation that the individual could only have "occasional" interaction with co-workers, supervisors, and the public. (*Id.*) The VE testified that the jobs would still be available. (*Id.*) The

8

VE testified that the jobs would still be available if the individual could only "occasionally" interact with co-workers, supervisors, and the public. (*Id.*)

The ALJ then discussed attendance limitations, and the VE stated that an employee could only miss one day per month on a regular basis, and that if she were off-task 20%, any work would be precluded.[4]  In response to questioning by plaintiff's counsel, the VE testified that an individual could change positions up to four times in an hour while at her work station, thus, the employee could still perform the specified occupations even if she had to change positions every 15 minutes.[5] (T. 91, 92-93). However, if the individual could lift and carry only up to 5 pounds, then even sedentary work would be precluded. (T. 91-92).

At the end of his testimony, the VE clarified that his opinions regarding overhead reaching, sit/stand options, absenteeism, and percentage of time off-task were based upon his own professional experience finding employment for individuals with disabilities. (T. 94).  These limitations are not covered in the Dictionary of Occupational Titles ("DOT"). (*Id.*)

There is a substantial amount of medical evidence in the administrative record. Rather than reciting the evidence at the outset, I will discuss the relevant materials in my analysis of plaintiff's claims.

---

[4] While the VE specifically stated that one absence per month on a regular basis would be the maximum tolerated by an employer, the VE did not indicate that the 20% off-task figure was a specific maximum limitation.  The ALJ asked whether a person who could be off-task 20% would be able to work, and the VE stated that no work was available for such an individual. (T. 90).

[5] There was a detailed discussion regarding the specifics of the sit/stand option. (T. 91, 92-93). The ALJ wanted to clarify exactly what the VE meant by his estimate and what the individual would be allowed to do. (*Id.*)

## IV.   **THE ALJ'S DECISION**

At step one of the sequential evaluation, the ALJ found that plaintiff met her insured status requirements for DIB through September 30, 2021, and that plaintiff has not engaged in SGA since her onset date of August 1, 2016. (T. 13).  The ALJ found that plaintiff has the following severe impairments at step two: "sacroiliitis, right; radiculitis, lumbar; bursitis, trochanteric, right; right lower extremity radiculopathy; obesity; post-traumatic stress disorder [("PTSD")]; generalized anxiety disorder; and persistent depressive disorder." (T. 13).  The ALJ also determined that plaintiff's ventral hernia and hypothyroidism were not severe, and that her Graves disease, hypoglycemia, goiter, irritable bowel syndrome, and borderline intellectual functioning were not "medically determinable." (T. 13-14).

At step three, the ALJ found that plaintiff did not have a listed impairment. (T. 14-17).  In making this determination, the ALJ considered Listings 1.02A (musculoskeletal impairments); 1.04 (spinal impairments); 12.04 (depressive, bipolar, and related disorders); 12.06 (anxiety and obsessive/compulsive disorders); and 12.15 (trauma and stressor-related disorders). (*Id.*)

At step four, the ALJ found that plaintiff had the RFC for light work, with several additional limitations. (T. 17).  Plaintiff could only stand and walk for 4 hours and sit for 6 hours. (T. 17).  She could occasionally climb stairs and ramps, and she could stoop, crouch, and kneel.  She could not crawl or climb ladders, ropes, or scaffolds.  She could not have concentrated exposure to extreme cold, vibration, or workplace hazards, including unprotected heights and moving machinery. (*Id.*)

Plaintiff could occasionally push, pull, or operate foot controls with her right lower extremity.  She could perform simple, routine, repetitive work that involves occasional changes to the work setting.  She could frequently interact with the public, but could not provide direct customer service or perform tasks involving fast-paced production. (*Id.*)

In making her step four determination, the ALJ considered the medical evidence, including opinion evidence, together with plaintiff's testimony, and her combined physical and mental impairments. (T. 17-23)  The ALJ concluded that plaintiff could not perform her previous jobs, but that in accordance with the VE's testimony, and considering plaintiff's age, education, and prior work experience, plaintiff could perform other work, existing in significant numbers in the national economy. (T. 24-26).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.   The ALJ's physical and mental RFC determinations are not supported by substantial evidence and are based upon legal error. (Pl.'s Br. at 8-23) (Points I and II) (Dkt. No. 16).

2.   The ALJ's step five determination is in error. (Pl.'s Br. at 23).

Defendant argues that the ALJ's decision was supported by substantial evidence, and the complaint should be dismissed. (Def.'s Br. at 11-25) (Dkt. No. 18).  Plaintiff has filed a reply brief. (Dkt. No. 21).  For the following reasons, this court agrees with the defendant and will dismiss the complaint.

## VII.  RFC/Weight of the Evidence

### A.  Legal Standards

#### 1.  RFC

RFC is "what [the] individual can still do despite his or her limitations.

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular

and continuing basis" means eight hours a day, for five days a week, or an equivalent

work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2

(N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)

(quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-

00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v.

Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F.

Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's

subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R.

§§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v.

Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019);

*Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions

plaintiff is capable of performing, and may not simply make conclusory statements

regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267

12

(N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.      Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he or she accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324,

2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

### 3.    Credibility/Consistency

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

14

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[6] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[7]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and

---

[6] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

[7] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings.

intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.   Analysis

#### 1.   Physical Impairments

Plaintiff first argues that the ALJ erred in determining that plaintiff had the physical RFC to perform light work. Plaintiff claims that the ALJ did not rely on any medical opinion in finding that plaintiff could perform the lifting requirements of light work, and that the ALJ erred in relying on Dr. Gilbert Jenouri, the consultative internist, whose opinion was vague. Plaintiff also argues that the ALJ failed to properly take into account any time off-task or absenteeism limitations.

The ALJ determined that plaintiff could stand and walk for four hours during the work day and sit for six hours. Plaintiff does not seem to challenge this finding. The standing and walking restrictions were contained in plaintiff's treating providers' medical source statements ("MSS"). (T. 595 - Dr. Michael Murphy, M.D. (PCP); 587 - Dr. Theodore Them, M.D. - (Occupational Health Specialist). On January 20. 2020, Dr. Them stated that plaintiff could only sit for two hours, while on January 28, 2020, Dr. Murphy estimated that plaintiff could sit for four hours with the same standing/walking restrictions. (*Id.*) The ALJ found that plaintiff could sit for six hours, but six hours of

16

sitting is not necessarily required for light work.[8]  In addition, Dr. Them and Dr. Murphy both found that plaintiff would have to change positions frequently.  Dr. Murphy found that plaintiff should change positions every 15 to 20 minutes, while Dr. Them found that plaintiff would need to change positions every 30 minutes. (T. 587, 595).  The VE testified that all the relevant jobs would still be available even if plaintiff had to change positions every 15 minutes. (T. 91, 92-93).  The ALJ clearly took into account the restrictions found in both Dr. Murphy's and Dr. Them's MSSs.

Thus, the remaining issue is whether plaintiff can meet the lifting and carrying requirement of light work.  The ALJ did not place any limitations on the lifting and carrying functions required for light work.  Both Dr. Them and Dr. Murphy estimated plaintiff would be limited to lifting and carrying 5 pounds frequently, but could never lift or carry any more than that.  The fact that the ALJ's determination does not match either MSS is not determinative.  It is well-settled that an ALJ's RFC determination need not match one provider's findings exactly. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of

---

[8]      (b) . . . Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

the evidence available to make an RFC finding that was consistent with the record as a whole.")  Thus, the court must examine whether the ALJ's lifting and carrying determination was supported by substantial evidence, even though it departed from the two opinions contained in the two MSS reports from which the ALJ adopted most of the other physical restrictions.

It is true that there are no MSSs which specifically state that plaintiff can lift 10 pounds frequently and up to 20 pounds.  Thus, plaintiff argues that there is no medical basis for the ALJ to find that plaintiff can perform these lifting requirements.  However, the ALJ based her determination on the record as a whole, including Dr. Jenouri's determination that plaintiff would only have a moderate limitation in lifting and carrying.

After plaintiff's injury on March 14, 2016, plaintiff saw Dr. Theodore F. Them, M.D. and Nurse Practitioner (NP") Karol White in connection with plaintiff's workers compensation claim. (T. 377-78).  On April 8, 2016,[9] NP White found that plaintiff ambulated with a slight right antalgic[10] gait, there was no tenderness over the spine, although plaintiff complained of some tenderness with palpation over the right sacroiliac joint, right buttock, and right hamstring. (T. 378).  Plaintiff had full spinal flexion and extension, normal muscle tone in the lower extremities, full strength, and no loss of sensation. (*Id.*)

---

[9] The court understands that this date is prior to plaintiff's alleged onset date, and the relevance of this information will be discussed below.

[10] Antalgic gait is an abnormal pattern of walking, secondary to pain, that ultimately causes the individual to limp. https://www.ncbi.nlm.nih.gov/books/NBK559243/

On April 29, 2016, NP White stated that plaintiff was following up on her right thigh strain, with "consequential sacroiliitis and trochanteric bursitis. (T. 375-77). Plaintiff's bursitis "remain[ed] resolved," there was no muscle spasm, plaintiff had full strength in her lower extremities, and she ambulated with no antalgia. (T. 376). NP White wrote that plaintiff's sacroiliitis could have been the consequence of altered gait due to the hamstring strain that she suffered. (*Id.*) NP White expressed concerns that the plaintiff was "exhibiting signs of symptom magnification and malingering," and encouraged plaintiff to return to full duty as soon as possible.[11] (T. 377). On May 9, 2016, NP White noted that plaintiff had a "rather exaggerated right-antalgic gait," had a small muscle spasm in her right hamstring, but muscle tone, strength, deep tendon reflexes, and spinal range of motion were all normal, except that plaintiff complained of pain in the sacroiliac joint with lumbar range of motion and pain in the right hamstring muscle when squatting. (T. 374). Once again, NP White assessed "malingering." (T. 374). She noted that the case was discussed with Dr. Them, and he "agreed with [the assessment] and plan." (T. 375). NP White examined plaintiff on May 20, 2016, but made no comments about malingering. (T. 373).

In April of 2018, plaintiff saw Dr. Lee Jacob Neubert, D.O., to whom she complained that she had lower back pain, radiating down her right leg. (T. 525). Upon physical examination, plaintiff's gait was "non-antalgic," and her muscle strength was "5/5" bilaterally in her lower extremities. (*Id.*) Her lumbar flexion was moderately limited, extension was minimally limited, and facet loading was negative. (*Id.*) Straight

---

[11] At the time of NP White's report, plaintiff had returned to work with restrictions. (T. 376-77).

leg raising was negative on the left and "limited by hamstring" on the right. (*Id.*)
Plaintiff exhibited tenderness in her sacroiliac joint. (T. 526).  There was no evaluation
of upper body range of motion or strength. (*Id.*)  Dr. Neubert offered "SI
radiofrequency ablation on the right." (*Id.*)

Plaintiff did not have the recommended treatment at that time.  In September of
2018, plaintiff was consultatively examined by Dr. Gilbert Jenouri, M.D., who the ALJ
found "persuasive." (T. 21).  In his September 21, 2018 report, Dr. Jenouri stated that
plaintiff had "moderate" restrictions for, inter alia, lifting and carrying. (T. 520).  In the
same examination, her gait was normal, and she could walk on heels and toes without
difficulty, notwithstanding that her squat was only 50%. (T. 518).  She was able to rise
from her chair without difficulty. (*Id.*)  Plaintiff's grip strength was "5/5 bilaterally,"
she had 5/5 strength in her upper and lower extremities, and there was full range of
motion in her upper extremities, with no sensory deficits noted. (T. 518-19).  While
plaintiff had limitations and positive findings, with limitations in her lumbar spine
range of motion and right sciatic notch tenderness, (T. 519), Dr. Jenouri found only
"moderate" limitations. (T. 520).  The ALJ discussed all of these findings. (T. 20).

Plaintiff claims that the term "moderate" is vague and not defined in the
regulations, and therefore, cannot support a finding that plaintiff can lift sufficient
weight to perform light work.  Recognizing that Dr. Jenouri's assessment was
generally, "somewhat vague," the ALJ found that the assessment was supported by
findings of decreased range of motion, but normal gait and full strength. (T. 21).  It has
been consistently held that "moderate" limitations on lifting or carrying are consistent

with a light work RFC. *Michael V. v. Comm'r of Soc. Sec.*, No. 6:18-CV-0481 (GTS), 2019 WL 4276722, at \*5 n.3 (N.D.N.Y. Sept. 10, 2019). *See also Raymonda C. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0178 (GTS), 2020 WL 42814, at \*4 (N.D.N.Y. Jan. 3, 2020) ("[A] 'moderate limitation' . . . is essentially equivalent to an ability to perform light work.") (collecting cases); *Gurney v. Colvin*, No. 14-CV-688S, 2016 WL 805405, at \*3 (W.D.N.Y. Mar. 2, 2016) (finding that moderate limitations for "repetitive heavy lifting, bending, reaching, pushing, pulling or carrying" are consistent with an RFC for a full range of light work); *April B. v. Saul*, No. 18-CV-0682, 2019 WL 4736243, at \*5 (N.D.N.Y. Sept. 27, 2019) ("[M]oderate limitations in standing and walking are consistent with light work.") (citations omitted); *Moore v. Comm'r of Soc. Sec.*, No. 16-CV-270, 2017 WL 1323460, at \*8 (N.D.N.Y. Apr. 10, 2017) ("[M]oderate limitations for sitting, standing, walking, bending, climbing stairs, and lifting or carrying heavy objects . . . [are] consistent with light work.") (citations omitted); *Martinez v. Comm'r of Soc. Sec.*,  No. 13 Civ. 159, 2016 WL 6885181, at \*13 (S.D.N.Y. Oct. 5, 2016), *report and recommendation adopted*, 2016 WL 6884905 (S.D.N.Y. Nov. 21, 2016) ("[M]oderate restrictions for lifting, pushing, pulling, overhead reaching, stooping, squatting, prolonged standing, and prolonged walking . . . are consistent with an RFC for light work.")

In her reply, plaintiff argues that the cases cited by the defendant are all fact specific, and that there is no case holding that moderate limitations equate to "any particular degree of functioning." (Pl.'s Reply Br. at 2).  To hold otherwise would be in violation of *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) and *Selian v. Astrue*, 708

21

F.3d 409, 421 (2d Cir. 2013).  However, in *Susan B. v. Comm'r of Soc. Sec.*, 551 F.
Supp. 3d 107 (W.D.N.Y. 2021), the court found that such terms are not always too
vague to constitute substantial evidence. (citing *Haggins v. Comm'r of Soc. Sec.*, No.
1:19-CV-00639, 2020 WL 4390698, at *5 (W.D.N.Y. July 31, 2020) ("courts have
routinely held that *Curry* does not stand for the broad proposition that a medical source
opinion which uses terms like 'mild' or 'moderate' is always too vague to constitute
substantial evidence–where the examiner conducts a thorough examination and
explains the basis for the opinion" (quoting *Filer v. Comm'r of Soc. Sec.*, 435 F. Supp.
3d 517, 524 (W.D.N.Y. 2020)).

The next medical record in the transcript from Dr. Them is dated in March of
2019. (T. 601-603).  Dr. Them specifically noted that plaintiff had not seen him for a
year, and that she "remained off work in the interim, without any evaluation or
treatment by me." (T. 601).  On March 11, 2019, Dr. Them observed mild right-sided
antalgia in addition to decreased strength and abnormal knee and ankle reflexes. (T.
602).  Plaintiff had grossly visible and palpable paralumbar spasm, unchanged from the
previous examination, and exquisite tenderness in the sacroiliac joint on the right, but
non-tender on the left.  Range of motion in the lumbar spine was limited to 50 degrees,
with minimal extension, lateral flexion, and trunk rotations. (*Id.*)  Straight-leg raising
was negative bilaterally, but plaintiff complained of pain in the sacroiliac joint at
extreme extension of the right lower extremity while she was in a supine position.  Dr.
Them noted that muscle strength "in the ***lower extremities***" was 3/5 in all muscle
groups, "although [plaintiff] was able to climb on and off the examination table with

*facility.*" (T. 602) (emphasis added).  Dr. Them noted that he would await consultation from Dr. Neubert. (*Id.*)

On April 3, 2019, plaintiff was examined by NP Lisa Roberts, in Dr. Neubert's office.[12] (T. 528-30).  Plaintiff reported continued right-sided low back and upper buttock pain, with a pain level of 5/10 on that day. (T. 528).  NP Roberts indicated that Dr. Neubert had suggested the ablation one year previously, but plaintiff had not gone through with the procedure at that time. (*Id.*)  The plaintiff indicated that her symptoms were aggravated by "bending, straightening, stretching, exercise, walking, sit to stand position, and cold." (*Id.*)  There was no mention of lifting or carrying.

On examination, her back range of motion was "normal," except for right side lateral bending causing sacroiliac pain. (T. 529).  Muscle strength was "grade 5" in both left and right lower extremities. (*Id.*)  Plaintiff's gait was antalgic, but she ambulated well without assistance. (*Id.*)  Her coordination was normal, and NP Roberts noted that there were no changes in injury type or physical exam since the previous examination. (*Id.*)  Dr. Neubert ultimately performed an SI joint rhizotomy in May of 2019.[13] (T. 562-63).

The ALJ found Dr. Murphy's MSS regarding plaintiff's physical limitations, particularly the lifting and carrying restrictions, "less persuasive." (T. 23).  While the

---

[12] The record contains an email indicating that plaintiff had missed six previous appointments ("no showed") with Dr. Neubert, and he was asked his permission to schedule plaintiff for another appointment. (T. 527).

[13] "Rhizotomy is a minimally invasive surgical procedure to remove sensation from a painful nerve by killing nerve fibers responsible for sending pain signals to the brain." https://www. hopkinsmedicine.org/health/treatment-tests-and-therapies/rhizotomy.

ALJ recognized that Dr. Murphy was plaintiff's primary care provider and had seen her since 2016, she correctly noted that most of Dr. Murphy's treatment notes between February of 2017 and August of 2018 were not related to her back impairment and were "typically routine follow up[s] for minor complaints and medication, with no significant ongoing objective findings." (T. 22). (*See* T. 470 - ingrown toenail; 475 (same); 479, 482 (sinus symptoms); 485 (sore throat); 489 (anxiety and unrelated abdominal pain); 494 (hernia and abdominal pain); 498 (cold symptoms); 502, 504 (anxiety follow-up); 506 (cold symptoms). Plaintiff's back was not even mentioned on the "problems" list, and often her "pain" was listed as "0/10." (T. 485, 489, 490, 498, 504). Dr. Murphy saw plaintiff more for her anxiety than he did for her back impairment, thus, the ALJ's finding that Dr. Murphy's opinion regarding plaintiff's lifting restrictions was "less persuasive" is supported by substantial evidence.

Plaintiff's back is rarely mentioned in Dr. Murphy's contemporaneous treatment notes, and he never assessed plaintiff's lower or upper body strength or range of motion as Dr. Jenouri did, albeit on a consultative basis. The basis for Dr. Murphy's off-task and absentee opinions regarding plaintiff's physical impairments is unclear.[14] On September 27, 2017, Dr. Murphy sent plaintiff to the emergency room, when she complained of abdominal pain and suspected hernia. (T. 398-400). The emergency room notes state that plaintiff did not have back pain, and her physical examination showed a "normal inspection of the back," with no "CVA tenderness."[15] (T. 399). She

---

[14] Dr. Murphy also submitted a mental MSS (T. 590-91) which will be discussed below.

[15] CVA stands for costovertebral angle. Pain in this area may indicate a kidney infection.

had normal range of motion in her extremities, and no motor or sensory deficits. (*Id.*) Upon discharge, plaintiff was told not to engage in strenuous activities and to refrain from working for three days.[16]  The court notes that the ALJ found the emergency room report "less persuasive" because plaintiff did have additional limitations. (T. 22).

Plaintiff criticizes the ALJ for stating that Dr. Murphy's reports did not demonstrate any significant ongoing findings, and argues that the lack of ongoing findings is understandable because Dr. Murphy was not treating primarily for her back-related issues. (Pl.'s Br. at 18).  Yet, he asks the court to adopt Dr. Murphy's lifting, off-task, and absentee estimates contained in his 2020 MSS, even though he was not treating plaintiff primarily for her back issues. If Dr. Murphy was not treating plaintiff primarily for those issues, and they are never mentioned in his reports, then the ALJ was correct in finding that his ultimate opinion on those issues was "less persuasive."

The ALJ correctly considered the sporadic and conservative nature of plaintiff's treatment.  There were two lengthy periods after plaintiff's onset date that she did not get ongoing treatment for her hips or back, while getting treatment for unrelated impairments: from March 2017 to February 2018 (T. 369, 598) and from April 2018 until March 2019 (T. 524, 601).  Plaintiff did not see Dr. Them for a year during the relevant time period, while seeing Dr. Murphy and not mentioning her back pain.[17]  As stated above, when plaintiff attempted to make an appointment with Dr. Neubert in

---

[16] Plaintiff was not working at the time.  This was the second time that plaintiff visited the emergency room complaining of abdominal pain.  The first time was in May of 2016, prior to plaintiff's disability onset date. (T. 402-410).

[17] On June 19, 2017, plaintiff saw Dr. Neubert for a "right sided sacroiliac joint injection." (T. 367).  There was no physical examination associated with these notes. (*Id.*)

April of 2019, his staff asked the doctor's permission to schedule the appointment due to plaintiff consistently failing to appear for her scheduled visits. (T. 527).

Plaintiff argues that the ALJ may not take the frequency or the conservative[18] nature of her treatment into account. In fact, plaintiff argues that the ALJ was required to show that more frequent treatment would have been necessary. However, the regulations specifically state that the nature of treatment is a factor in the Commissioner's determination. 20 C.F.R. § 404.1529(c)(3)(iv), (v),[19] (vi). Gaps in treatment may undermine plaintiff's subjective complaints of pain and symptoms. *See Femminella v. Comm'r of Soc. Sec.*, 524 F. Supp. 3d 20, 22 (E.D.N.Y. Mar. 8, 2021) (both logic and law suggest that the ALJ could properly rely upon gaps in treatment to support his determination) (citing *Vered v. Colvin*, No. 14-CV-4590 (KAM), 2017 WL 639245, at *16 (E.D.N.Y. Feb. 16, 2017) ("[T]reatment gaps undermined plaintiff's claim that his impairments were severe [such that] the ALJ reasonably found that plaintiff's medical history during the relevant period was not consistent with plaintiff's subjective testimony about his symptoms.") (citing S.S.R. 16-3P, 2016 WL 1119029, at *8) ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may

---

[18] Plaintiff took ibuprofen, Tylenol, or naproxen for her back and hip pain (Tr. 373, 378, 400 595), and she received two steroid injections in her right hip (in September 2016 and June 2017) (Tr. 367, 370–71). Plaintiff had the radiofrequency ablation in May 2019 (one full year after it was recommended) (Tr. 524, 562).

[19] This subsection states that the Commissioner will consider (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms.

find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."); *Moscatiello v. Apfel*, 129 F. Supp. 2d 481, 489 (E.D.N.Y. 2001) ("The ALJ is permitted to attach significance to plaintiff's failure to seek medical treatment.")). In addition, it is the plaintiff's burden at the first four steps of the disability analysis. *See Torro C. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1296 (DB), 2022 WL 836433, at *5 (W.D.N.Y. Mar. 21, 2022) (citing inter alia *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry. . . .")

The ALJ does not have to establish that more or different treatment would have been necessary.[20] *See Cherise A v. Comm'r of Soc. Sec.*, No. 3:19-CV-559 (TWD), 2020 WL 4500686, at *6 (N.D.N.Y. Aug. 5, 2020) (the plaintiff's conservative treatment was a "relevant factor[] in calculating Plaintiff's RFC") (citing *Ganoe v. Comm'r of Soc. Sec.*, No. 14-1396, 2015 WL 9267442, at *4 (N.D.N.Y. Nov. 23, 2015) ("To be sure, an ALJ may take plaintiff's conservative treatment into consideration as additional evidence to support his overall determination regarding a treating source's opinion.")).

---

[20] At best, Social Security Ruling ("SSR") 16-3P provides that the Commissioner "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." 2017 WL 5180304, at *9 (2017).  However, in this case the ALJ did not find that plaintiff's complaints were inconsistent with the medical evidence solely because she had gaps in treatment or only had conservative treatment.  These considerations only factored into the ALJ's decision, which was based on the medical evidence and, in part, on the treating physicians' own assessments of her abilities. None of the explanations cited in the SSR for gaps in treatment apply to plaintiff's case, particularly because during the gaps in treatment, she sought medical treatment for other medical conditions without mentioning her hips or her back. The court also notes that on January 20, 2020, plaintiff stated that she missed her previous appointment with Dr. Them due to "'car trouble and sick kids,'" not because of her impairments. (T. 581).

Plaintiff also argues that the ALJ could not consider "some" nurse practitioner's determination that plaintiff was exaggerating her symptoms or "malingering." While plaintiff is correct that these comments were made a few months **_before_** plaintiff's alleged August 1, 2016 onset date, the ALJ cited these remarks in conjunction with all the other evidence in the record. Such comments are relevant for purposes of determining plaintiff's tendency to exaggerate.

The ALJ noted that on April 29, 2016, NP White found that plaintiff was exhibiting symptom magnification and malingering. (T. 18, 377). Plaintiff saw NP White again on May 6, 2016 and May 20, 2016, which was still a few months prior to her onset date. (T. 372-73, 373-75). NP White is not just "some" nurse practitioner. She happened to be a nurse practitioner who worked for Dr. Them, one of plaintiff's treating physicians, and NP White specifically stated in the above reports that the case was discussed with Dr. Them, who "agreed with the above **_assessment_** and plan." (T. 373, 375, 377, 378) (emphasis in originals).

Dr. Them and NP White were examining plaintiff in conjunction with her Workers' Compensation claim, and they were referring to the injury that plaintiff ultimately alleges is one of the bases of her disability. (_Id._) While there is no question that Dr. Them wrote more restrictive evaluations subsequent to these first pre-onset date reports,[21] and authored one of the more restrictive MSS relative to plaintiff's lifting

---

[21] Plaintiff exhibited limited range of motion, spasms and tenderness in March of 2018, March of 2019, September of 2019, November of 2019, and January of 2020. (T. 598, 602, 605, 608, 611). The ALJ considered these limitations is determining plaintiff's RFC. Notwithstanding the above findings, Dr. Them still found that plaintiff could stand and walk for four hours during the day, a limitation that was adopted by the ALJ in determining the RFC. (T. 17, 587).

ability, the ALJ did not err in considering that plaintiff's treating providers originally suspected that she was malingering or exhibiting symptom magnification.  In addition, other than the lifting requirement, Dr. Them's more recent MSS is consistent with an ability to perform the limited range of light work in accordance with the ALJ's RFC and the VE's testimony.

The evidence is conflicting.  However, it is for the ALJ, not the court to weigh conflicting evidence and establish an RFC that is consistent with the record as a whole. *Tammy S. o/b/o A.L.S.*, No. 1:20-CV-931 (DB), 2022 WL 1488431, at * 11 (W.D.N.Y. May 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record"); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence."). "'If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusions must be upheld.'" *Id.* (quoting *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014)).

The ALJ was not simply citing evidence favorable to the Commissioner, and she recognized and took into consideration the additional, more severe restrictions which were noted in the more recent medical reports.  The ALJ recognized that the evidence was conflicting, and established an RFC consistent with all of the evidence of record, including medical evidence and plaintiff's testimony.

The ALJ also considered plaintiff's daily activities. (T. 23)  Although plaintiff testified that she sometimes did not shower or get out of bed, she told Dr. Jenouri that

she cooked and cleaned every day, shopped and did laundry once per week, showered and dressed "every day," and took care of her children every day.[22] (*Compare* T. 71-72 (seven to ten "bad days" per month) *with* T. 517 (ADLs every day)).  While there is no medical report, stating specifically that plaintiff could lift and carry 10 pounds frequently and up to 20 pounds, the ALJ considered Dr. Jenouri's assessment together with the other evidence in the record, including her activities, sporadic and conservative treatment.  Thus, the ALJ's finding that plaintiff could perform the limited range of light work is supported by substantial evidence, including her finding that plaintiff could perform the lifting requirements of light work.

## 2.   Mental Impairments

Mentally, the ALJ found that plaintiff could perform simple, routine, repetitive work that involved occasional changes in the work setting. (T. 17).  She could frequently interact with supervisors and co-workers and occasionally interact with the public, but could not provide direct customer service and could not perform tasks involving fast-paced production.[23] (*Id.*)   Plaintiff argues that this finding is not supported by substantial evidence because Dr. Slowik determined that plaintiff's abilities to "sustain an ordinary routine and regulate emotions" were "moderately to markedly limited." (T. 514).  In addition, on January 28, 2020, Dr. Murphy submitted a

---

[22] On the same day, during plaintiff's mental consultative examination, she told Dr. Amanda Slowik, Psy. D. that she lacked the motivation to dress, bathe, and groom herself on a regular basis. (T. 513).

[23] In a footnote, the ALJ noted that the VE testified that the listed jobs would still be available even if the plaintiff was "further limited to a sit-stand option and only occasional contact with supervisors and coworkers." (T. 25 fn.1).

mental MSS in which he found that plaintiff would be off-task more than 20% of the day and would be absent three or more days per month due to her anxiety, PTSD, and depression. (T. 590-91). In the same MSS checkbox form, Dr. Murphy found that plaintiff's would have marked limitations in her ability to respond appropriately to ordinary stressors in a work setting with simple tasks. (T. 590).

Plaintiff's therapist, Christine Faye, LCSW also submitted a check box MSS form indicating that plaintiff would have marked limitations in maintaining regular attendance, performing activities within a schedule, being punctual, or performing at a consistent pace, but only had moderate limitations in responding appropriately to ordinary stressors in a work setting with simple tasks. (T. 614). Ms. Faye found that plaintiff would be "moderately" off-task, 16-20% of the day, but did not estimate absenteeism. (T. 615). The question involved analyzing absenteeism based on a combination of mental impairments and medication. (T. 615). Ms. Faye responded to the question by simply writing in the blank that she was not aware of any medication. (*Id.*)

The ALJ found that Dr. Slowik's opinion was only partially persuasive, particularly that plaintiff would have a moderate to marked limitation in sustaining an ordinary routine and regulating emotions. The ALJ found that the asserted marked limitation was not supported by her examination and appeared to be based on plaintiff's subjective complaints. (T. 22). However, the ALJ also stated that the marked limitation was inconsistent with the "overall" record, given "the absence of more serious ongoing complaints and the claimant's limited and conservative treatment." (T. 22). The ALJ

discounted Dr. Murphy's MSS, finding it "less persuasive" because Dr. Murphy's treatment notes documented no significant positive objective findings to support such limitations, indicating in one report that plaintiff was reporting "'a good response' to her medication." (T. 23) (citing T. 590-91).

The ALJ's assessment of plaintiff's mental limitations is supported by substantial evidence. Most of Dr. Murphy's contemporaneous treatment notes only mention anxiety as one of plaintiff's problems. On June 22 and on October 24, 2017, Dr. Murphy specifically evaluated plaintiff's anxiety in conjunction with a review of her medication, Klonopin. (T. 489-91, 502-504). In the June 22 report, Dr. Murphy indicated that plaintiff's medication "worked well for her," and his examination showed appropriate mood and affect. (T. 502, 504). On October 24, Dr. Murphy stated that plaintiff came in for a follow-up of abdominal pain, sinus trouble, and anxiety. (T. 489). Although he stated that plaintiff told him that functioning was "very difficult," and she was having fearful thoughts and depressed mood, Dr. Murphy again stated that she had a good response to medication. (T. 489-91).

In February, July, September, and December of 2017, there was little to no mention of plaintiff's mental status,[24] and often, Dr. Murphy did not even assess plaintiff's psychiatric state. (T. 494 (no psychiatric examination), 506-508 (no psychiatric symptoms claimed); 500 (no psychiatric examination); 485-87 (no psychiatric examination)). On April 24, 2018, plaintiff complained of sinus symptoms. (T. 479). When plaintiff was asked whether she was "feeling down depressed or

---

[24] "Anxiety State" was listed as one of plaintiff's problems, indicating that this impairment began in 2013 and was "chronic." (*See e.g.* T. 474, 485, 494, 506).

hopeless" or whether she had "little interest in pleasure or doing things" for the PHQ-2,[25] she responded "not at all." (T. 479).  Based on these answers, further testing was not conducted. (*Id.*)  Dr. Murphy's note stated that plaintiff's cognitive status was "unchanged." (T. 482).  On June 12, 2018, plaintiff gave the same answers on the PHQ. (T. 473-76).  On August 28, 2018, Dr. Murphy saw plaintiff for an ingrown toenail. (T. 468).

On two days in 2017, plaintiff was examined for her thyroid condition by Dr. Jillene Braithwaite, D.O. (T. 432-44, 436-39).[26]  On March 17, 2017, in addition to examining plaintiff for her thyroid, Dr. Braithwaite stated that plaintiff had appropriate mood and affect, normal insight and normal judgment. (T. 439).  On December 18, 2017, Dr. Braithwaite noted that plaintiff was dealing with depression that had worsened. (T. 432).  However, upon examination, plaintiff exhibited normal mood and affect. (T. 434).  On September 12, 2018, Dr. Braithwaite found that plaintiff's mental examination was "negative" for anxiety, depression, and insomnia, and her cognitive status remained "unchanged," with an otherwise normal examination. (T. 575-76).  On January 2, 2020, Dr. Braithwaite again assessed normal mental findings, stated that plaintiff's cognitive status remained unchanged, and commented that plaintiff's memory was normal. (T. 571).

None of Dr. Murphy's medical records which were before the ALJ were

---

[25] Patient Health Questionnaire-2 "inquires about the frequency of depressed mood and anhedonia over the past 2 weeks." https://pubmed.ncbi.nlm.nih.gov/14583691/

[26] Other treatment providers noted a possible link between plaintiff's thyroid condition and her anxiety.  (T. 447, 537).

consistent with the level of mental restriction that Dr. Murphy stated in his MSS.  In her appeal to the Appeals Council, plaintiff submitted two additional reports from Dr. Murphy, dating December 5, 2019 and March 31, 2020. (T. 34-53).  The records were accepted by the Appeals Council and made part of the record, although the Appeals Council found that they would not have changed the ALJ's decision. (T. 1-2). On December 5th, plaintiff saw a physician's assistant in Dr. Murphy's office for a follow up for her thyroid and for anxiety. (T. 49).  The PA's note states that plaintiff's anxiety and depressive symptoms occurred "every day," but then stated that "related symptoms" were "well-controlled," and there was "improvement of initial symptoms." (*Id.*)  The PA also noted plaintiff's good response to medication, and that "Patient presents for a medication review. No complaints at this time." (*Id.*)  Although the review of systems ("ROS") indicated that plaintiff had anxiety, difficulty concentrating, excessive worry, felt down, depressed, or hopeless, the mental examination was "normal." (T. 51-52).

On January 28, 2020, Dr. Murphy noted that plaintiff was following up for cold symptoms, depression, and sacroiliitis. (T. 44).  With respect to the depression, Dr. Murphy stated that the "first" episode occurred in 2007, and plaintiff was currently presenting with anxious fearful thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, and diminished interest. (T. 44, 45-46 (Review of Symptoms)) She was easily startled, worried excessively, had racing thoughts, and restlessness. Depression was aggravated by conflict, stress, or traumatic memories. (*Id.*)  Dr. Murphy's assessment was "***current moderate*** episode of major depressive disorder ***without prior episode***." (T. 46) (emphasis added).  Although vague, this statement

indicates that plaintiff's symptoms were "moderate," were "current," and that she had a prior episode in 2007, but not that these symptoms had continued for a significant period of time, or for the entire relevant time period herein.  Dr. Murphy included plaintiff's anxiety as a separate assessment, and directed her to continue her medications.  Thus, Dr. Murphy's additional records did not support his restrictive MSS.

Plaintiff did not begin seeing her counselors, LCSW Fay and LMSW Christine Sawicki with Tioga County Mental Hygiene until April of 2018.[27] (T. 447).  At that time, plaintiff told these counselors that she had anxiety since 2007, and that recently she had been examined for disability benefits, and was encouraged to seek ongoing therapy. (*Id.*)  Plaintiff stated that her current symptoms started two years prior when she became homeless[28] with her two sons, and described her stress as "teenage stuff" related to her children. (*Id.*)  She reported no formal mental health treatment, except for some counseling "a couple of times."  Plaintiff stated that she just wanted to be able to "vent" and to have someone who could help her with "coping strategies" because she felt overwhelmed. (*Id.*) (*See also* T. 454 (summary)). When plaintiff was asked about her other "health concerns," she mentioned her thyroid, and she stated that she saw her primary care physician every six months to "assess for Klonopin," but never mentioned any problems with her back and told the counselors that she did not remember the last

---

[27] The Tioga Mental Hygiene reports are often signed by both counselors, although only LCSW Fay signed the MSS.

[28] Plaintiff was not homeless at the time of her interview with LCSW Fay, who stated in her report, that plaintiff lived in a mobile home with her three children. (T. 447).

time that she had a complete physical. (T. 448-49).

The counselors conducted a mental health evaluation during the April 2018 visit. (T. 548-49).  The assessment was mostly within normal limits. (*Id.*)  There were no memory or attention deficits noted, plaintiff was cooperative, her mood euthymic, her affect was full, her thought processes and thought content were normal. (*Id.*)  In fact, her cognition was listed as "normal." (T. 549).  In the cognition category were sub-categories, including memory, attention/concentration, fund of knowledge, ability to abstract, orientation, reading and writing, ability to abstract, calculation ability, and visuospacial ability. (*Id.*)  Her intelligence was listed as "average," her insight was normal, while her judgment was "mildly" impaired. (*Id.*)  Below the check-box mental health evaluation, the counselors elaborated on the examination, stating that plaintiff presented with euthymic mood, full affect, and was fully cooperative.  She became "briefly" tearful when discussing her past history of abusive relationships. (*Id.*)

Plaintiff was discharged from Tioga Mental Hygiene on January 2, 2019. (T. 555).  The treatment note indicates that plaintiff was being discharged because it had been 58 days since her last session, and she had missed her last three consecutive sessions. (T. 555).  The summary included a statement that plaintiff has sought treatment to "follow through with therapy for her disability application."[29] (*Id.*)  The discharge summary also stated that plaintiff often used the treatment sessions to "vent," mostly about family frustrations, and did not talk about her own anxiety and inner

---

[29] Other stated goals of plaintiff's therapy were to maintain sobriety, improve successful management of anxiety and worry, and improve management of family stressors. (T. 555).  However, plaintiff's attendance was inconsistent, sometimes missing 2-3 sessions in a row for various reasons. (*Id.*)

thoughts. (*Id.*)  The discharge summary was signed by LCSW Amanda Brechko and LCSW Sarah Begeal. (T. 557).  It does not appear that any of the other contemporaneous treatment notes are in the record.[30]  The documents that do appear in the record show relatively normal findings, including attention, concentration, and memory.  Thus, the ALJ was correct in finding that LCSW Fay's very limiting MSS was less persuasive.  In fact, as the ALJ notes, LCSW Fay states in her MSS that she was unaware of any medication taken by the plaintiff.  It is clear from the Tioga Mental Hygiene records, and it is mentioned several times, that plaintiff was taking Klonopin, which was managed by her primary care physician Dr. Murphy. (*See* T. 449) ("client reports she sees her primary care . . . approximately every six months to assess for Klonopin" - "client reports taking the following medications: . . . Levothyroxine . . . Klonopin, 2 mgs as needed, prescribed by Dr. Murphy, Candor).

This error is particularly important because Klonopin is a medication taken for panic and anxiety,[31] and Dr. Murphy specifically stated that the medication was working well for the plaintiff. (T. 502).  The ALJ correctly noted that the record documented limited and conservative treatment by LCSW Fay, and her statement that she was "unaware" of any medications suggested that the counselor was not familiar

---

[30] The record contains a list of appointments by date, with an indication of whether plaintiff was seen on a particular date, but there are no contemporaneous treatment records accompanying that list. (T. 558-59).  Plaintiff appears to have been seen 27 times by Tioga Mental Hygiene. (*Id.*)

[31] Klonopin is a brand name for the drug clonazepam, which is prescribed for, inter alia, panic disorders, anxiety, and seizures. https://www.nami.org/About-Mental-Illness/Treatments/Mental-Health-Medications/Types-of-Medication/Clonazepam-(Klonopin).

with plaintiff's ongoing treatment.[32] (T. 23).  Thus, the ALJ was justified in discounting
LCSW Fay's January 27, 2020 MSS and determining that those notes did not support
"marked" limitations of any kind, nor did they support any off-task or absentee
assessment. (T. 614-15).

The ALJ's RFC accounted for plaintiff's impairments.  Her antalgic gait, some
decreased strength, and decreased range of motion were considered in the physical
RFC. (T. 23).  The ALJ also considered plaintiff's radiculopathy in determining that she
could only occasionally push, pull, or operate foot controls with her right foot. (*Id.*)
However, the ALJ found that additional limitations were not warranted.  The ALJ
considered plaintiff's mental impairments in limiting plaintiff to simple work, that is
low stress in that it is routine, repetitive, and involves only occasional changes in the
work setting, with significantly limited social interactions and no tasks involving fast
pace requirements. (T. 23-24).

Moderate mental limitations have been held to be consistent with and ability to
perform unskilled work, which incorporates these limitations. *See Whipple v. Astrue*,
479 F. App'x. 367, 370 (2d Cir. 2012) (consultative examiners' findings that plaintiff's
depression caused moderate limitations in social functioning ultimately supported the
ALJ's determination that plaintiff was capable of performing work that involved simple

---

[32] The ALJ's statement was diplomatic.  Plaintiff was discharged from treatment by Tioga
Mental Hygiene in January of 2019, and there is one note in the record dated in May of 2019, although
it is unclear whether plaintiff was readmitted to the program. (T. 552-54).  The May 1, 2019 states that
it is an update, but discusses only plaintiff's possible substance abuse, with no discussion of any other
of plaintiff's mental limitations.  Plaintiff had been taking Klonopin for years, even prior to her
treatment by LCSW Fay.  If LCSW Fay was unaware of plaintiff's medications, she was not aware of
plaintiff's ongoing treatment or her past treatment, and she did not even review her own records in
completing the MSS.

tasks and allowed for a low-stress environment);*Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 389, 400 (W.D.N.Y. 2018) (ALJ's mental RFC limiting plaintiff to simple routine work properly accounted for opinions plaintiff had moderate limitations in various areas of mental functioning); *Cowley v. Berryhill*, 312 F. Supp. 3d 381, 384 (W.D.N.Y. 2018) (RFC for unskilled work accounted for moderate limitations with respect to stress); *Tatelman v. Colvin*, 296 F. Supp. 3d 608, 613 (W.D.N. Y. 2017) ("it is well-settled that a limitation to unskilled work . . . sufficiently accounts for limitations relating to stress and production pace"); *Washburn v. Colvin*, 286 F. Supp. 3d 561, 566 (W.D.N.Y. 2017), *appeal dismissed* (Mar. 30, 2018) ("It is well settled that a limitation to unskilled work sufficiently accounts for moderate limitations in work-related functioning.").  The ALJ resolved conflicting evidence in the record. Such a determination is within the province of the Commissioner. *See Ridley G. V. Comm'r of Soc. Sec.*, No. 1:20-CV-773 (CFH), 2021 WL 4307507, at *8-10 (N.D.N.Y. Sept. 22, 2021) (citing *Tanya S. v. Saul*, 410 F. Supp. 3d 436, 445 (N.D.N.Y. 2019) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("'[i]n deciding a disability claim, an ALJ is tasked with 'weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole,' even if that finding does not perfectly correspond with any of the opinions of cited medical sources."); *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *10 (N.D.N.Y. Mar. 19, 2019) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion." (citing 20 C.F.R. § 416.946(c)).  In this case, because the ALJ properly discounted Dr. Slowik's finding that plaintiff would have any more than

moderate limitations in her mental functioning, her mental RFC was supported by the evidence in the record.

## VIII. <u>Step 5 Determination</u>

### A.    Legal Standards

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert.  20 C.F.R. §§ 404.1566, 416.966.  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, generally, the VE is questioned using a hypothetical question that incorporates plaintiff's limitations. Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion." *Dumas*, 712 F.2d at 1554.  *See also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical

question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

### B.    Analysis

Plaintiff argues that the ALJ's step five analysis is flawed because her RFC was not supported by substantial evidence.  However, because this court has determined that the ALJ's RFC was properly supported, the ALJ did not err in basing her questioning of the VE on that RFC, and in relying on the VE's resulting opinion.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated: June 1, 2022

Andrew T. Baxter
U.S. Magistrate Judge